And the next case coming up is Nia versus Bank of America. And while they are setting up, I just want to tell counsel for the next case, the final case in the calendar, we're splitting time 10, 5, and 5. Those are all explained. That's going to be a hard count, not a soft count. I'll explain what that means. And you may proceed when you're ready. Good morning, Your Honors. My name is Jason Rathod. I represent the appellant, Mohamed Farshad Abdollah Nia. I'll reserve two minutes of my time. Very well. May it please the Court, the District Court in this case erred in granting summary judgment for Bank of America for four reasons. First, the District Court erred in finding no genuine dispute of material fact as to whether the bank qualified for the immunity provision in the International Emergency Economic Powers Act, IEPA. Plaintiff presented material facts that, in closing Dr. Nia's account, the bank did not act pursuant to or in reliance on an obligation imposed by IEPA and did not act in good faith. Second, the District Court erred by dismissing the civil rights claims. The bank has a facially discriminatory policy that was the but-for cause of Dr. Nia's injury under Section 1981, ACOA, and the state UNRRA claim. The McDonnell-Douglas framework does not apply and no further showing was required. Third, the Court's finding of preemption of the state law claims rested on its misapplication of the IEPA immunity provision. Because the provision does not apply and because the bank's obligations under state and federal law can be readily harmonized, there is no obstacle preemption. Fourth, regardless of the fate of the IEPA immunity provision or preemption, plaintiff's claims for unfairness and fraudulent conduct under the UCL should have survived. Those claims arise from the bank's failures to honor its own promises and comply with its own policies with respect to Dr. Nia. First, as to good faith, the bank did not act in good faith. All the ITSR requires is that banks not service Iranian accounts. Iranian accounts are defined as those of individuals physically present and ordinarily resident in Iran. The closure of Dr. Nia's account was not done in good faith. Good faith performance must be objectively reasonable. For example, from a recent Ninth Circuit case, 3500 Sepulveda Limited Liability Company v. Macy's W. Stores, Inc., 980 F. 1317, Ninth Circuit 2020, the covenant of good faith finds particular applications in situations where one party is invested with the discretionary power affecting the rights of another. The party with discretionary power must exercise such power in good faith through objectively reasonable conduct. There's a lack of good faith and a lack of objective reasonableness when, under the bank's own definition of good faith, there are knowledge of circumstances which put the bank on notice of a problem. That comes from the 1968 Black's Law Dictionary definition. Here, let me first by saying that the framework I would analyze why it was objectively unreasonable is first there's the original sin that the bank committed, which was the consumer residency monitoring program is facially discriminatory on the basis of protected characteristics, which are citizenship and nationality, when the legal mandate is facially neutral. So they impose a discriminatory policy on a facially neutral legal mandate. That is not acting in good faith. It's not engaged in fair dealing, which is embedded within the definition of good faith itself. The bank's definition also of good faith says it requires freedom from knowledge of circumstances which ought to put the holder upon inquiry. Here, the bank was put on notice to inquire about the lawfulness and fairness of its policy through multiple sources. First, one, several complaints lodged by consumers with the Consumer Financial Protection Bureau. And to take just one example of a CFPB complaint, if you look at Volume 7 ER 1826 to 1828, this is a complaint from February 13, 2018. It describes very similar facts from an Iranian national student living in the U.S. who does everything they possibly can to comply with the CRM. And they're turned away. And they get nowhere. Two things I want to highlight are, one, in that complaint, which, by the way, we know it's an Iranian national because the CFPB missed a redaction. It does specifically say Iranian. The others, you can infer it. But for this one, it explicitly says it. She says, I asked what the reason for restricting my account is. This is to a Bank of America representative. Specifically, I asked if it is because of my immigration documentation or my nationality. And she responded, my nationality. It ends with, it is notable that I have to pay the legal fees for my immigration services by the end of the week. But now, due to the restriction of my account, I'm not able to do so. Besides, I currently have no other account with any other bank, and I don't have any access to any banking services. It has been two days now, and I have no access to my funds, and it has crippled my life. The record showed the 30P6 witness, Cheryl Coate, at Volume 7 ER 1589-91, that these CFPB complaints were reviewed by a dedicated unit and escalated to leadership in Bank of America. They reviewed complaints just like this about how it devastated the lives of several Iranian nationals. And they just proceeded, even though they were on notice of this, that their policies were resulting in the unnecessary closure of many accounts. They were also on notice from regulators. The Financial Crimes Enforcement Network in their 2018 Iran advisory, that's at 5 ER 1130, said financial institutions should not take this guidance to mean that all transactions involving Iran, Iranian citizens, or persons with connections to Iran are suspicious or prohibited. Right, but the bank is allowed to consider citizenship as a risk factor here. So I guess I'm having trouble understanding how an action, which seems to me to be clearly taken in reliance on the statute – like what's the – I mean what's the strongest evidence here that the bank was acting in bad faith? I know it's not compelled to do certain things, but I guess what went wrong or where did it begin to go wrong here? Yes, Your Honor. So I would point out to that risk matrix that the bank looks to. In the promulgating notice for that Appendix A at 74 Fed Reg 57593, PIN site 595, it specifically says that this risk matrix imposes no obligations. And the IEPA exculpatory provision, it specifically speaks to an obligation. And so if this – what they're relying on says there's no obligation imposed, then they cannot rely on that as an instruction because there's nothing in there that's binding on the bank that compels this conduct. It's merely advisory. And furthermore, in the description of non-resident aliens, it says higher risk customers may include non-resident aliens. And so it's strictly permissive language. So if it's going to be in accordance with that, this is permissive language that in the disclaimer of the promulgating notice says imposes no obligations. So there is nothing that compels them to do that. So because it's a facially neutral legal mandate, it is a lack of good faith to then impose a facially discriminatory criteria. And then using their own definition of good faith, which is are you on notice as you implement this that something's wrong here? The CFPB complains, the letter also from the National Iranian American Council that says the way you're administering this is resulting in an absurd number of account closures. All of these sources of information that put them on inquiry notice that something is wrong here, and yet they still persisted in what they did. And a reasonable juror could have viewed that evidence and concluded that the bank did not act in good faith. There are genuine disputes of material fact there. If upon inquiry have they actually taken one of these offerings that, hey, are we doing this correctly? What comes out in the evidence from the case is that their own executive of the sanctions program admits that it was unnecessary to have Iranian citizenship as the sole criteria for the CRM. That's at 6 ER 1337. Their own expert says there's alternative means of compliance for those that are in the sanctions regions of Ukraine under identical sanctions. He says that the bank could just do for them what they do to the Iranian population, which is that they take an address at account opening. If it's outside of the sanctioned region, then they just use other means of compliance to ensure that they're not engaged in a prohibited transaction. So he says they could do that exact same thing. That's at 6 ER 1326. And then the plaintiff's expert, Peter Piotrowski, at 3 ER 547, notes that there's an 88 percent error rate of the bank's policy, which means that he analyzed just basic data that they had. And it showed that in 88 percent of the time, there was clear evidence that the person was physically present, ordinarily resident in the U.S. when they closed their account. He said in his words at 3 ER 547, this is a drag net. This isn't reasonable. And that's just the exact same facts as Dr. Nia. When you look at his facts, the history of the credit card history that he has, it clearly shows he's just making purchases at Whole Foods Ralph's in Southern California. They place calls to him while he's in California. They know that he's not in Iran because their own evidence says that they cannot place a call to a sanctioned jurisdiction. So during this entire time, they know he's physically present in the United States. And then he tells them, I'm about to upload my green card. And they said, that's fine. Just do that, and then everything will be good on your account. But instead, they immediately closed his account, even though it's within the six-month secret deadline that they imposed upon him. And he's unable to do that. And this is just the Piotrowski evidence of an 88 percent error rate shows that this isn't just Dr. Nia. This is a drag net for Iranian citizens. So all of this evidence, collectively, the totality of it, shows that the bank could have – the bank did not act in good faith. There's a genuine dispute of material fact on that front. Moving to the civil rights claim. So with – basically, on the civil rights claims, the court was correct in saying that the plaintiff has shown a facially discriminatory policy. And then the – there's no reason to reinvent the wheel on what – like how to prove a civil rights claim, because once that's shown, it's dispositive evidence. And then the bank can come forward and say, here's our affirmative defense under IEPA, but for the reasons I just stated, that does not apply. Even though if you were to look to their supposed neutral defense, their own case, Gurdon v. Continental Airlines, 692 F. 2nd, 602, 9th Circuit, 1982. It shows that the means chosen to achieve the purportedly neutral objective, they can't themselves discriminate on the basis of a protected classification. And that's what the facts are here. They're – sure, sanctions compliant, laudable goal, but you can't – the means you select to achieve that cannot themselves be based on a prohibited classification. On preemption, the district court erred in finding conflict or obstacle preemption. There's no basis for finding preemption. Preemption occurs when it is physically impossible to comply with both state and federal statutes. That's from Pacific Gas and Electric Company v. State Energy Reservation Conservation and Development Commission, 461 U.S. 190, 1983. And so there's simply – it's simply possible to comply both with their sanctions obligations. In fact, they do it with the Ukrainian population for the regions that are subject to the exact same sanctions as Iran without this sort of dragnet approach that they take with the Iranians. Their own expert says you could do the exact same thing with Iran. And the plaintiff's expert says, in fact, it would be better if you did that because then your focus is actually on prohibited transactions rather than a focus on rigorously policing these documents from people that has no nexus to the actual prohibition set forth in the ITSR. And then finally for the UCL claims, even if the court were to find that the IEPA good faith provision applies, even if they were to find that the other claims are somehow preempted by obstacle preemption, the claims for unfairness and fraudulent conduct, those still survive because those are unique to Dr. Nia. And those are unique to the circumstances in which he complied with everything they asked. He honored their policy. He did everything correct. Their own documents misrepresented what was required to comply with the policy. He submitted the I-797C form, which they said would satisfy an obligation. And yet they still closed this account. And they knew that he was in Southern California when they did so. They also promised him that if you upload your green card, everything will be good with your account. But then they closed it prematurely before he could do so. And so based on this totality of facts, that could both be a basis for a finding of unfairness under the UCL and also a finding for fraudulent conduct under the UCL. I'll reserve the rest of my time.  Very well. Thank you, counsel. Good morning, Your Honors. My name is Michael Kimberly for Appley Bank of America. Your Honors, plaintiff's theory in this case is that a bank's consumer due diligence program developed to comply with sanctions, regulations, and OFAC guidance promulgated under IEPA is disentitled to IEPA's liability shield and violates various civil rights laws, anti-discrimination laws. If it takes into account whether consumers are citizens of a comprehensively sanctioned nation and require those who are to prove temporary U.S. residents on a biannual basis, never minding that ordinary residents outside of that nation is a legal precondition to providing lawful banking services to such individuals. And we submit that just is not a tenable legal theory. Can I – so it seems perhaps maybe not the only crux, but one crux as far as the difference between your side and their side on this argument in this case is they take the position that in order to have the benefit of a shield, that the actions you took have to be compelled by. And I don't understand that your argument to be that your actions, specifically these actions, were compelled in the sense that I think you would concede or at least factually maybe some of your experts concede that you could have attacked this problem maybe a different way. But this is one way to attack it, and another way would it be things maybe I don't completely understand like knowing where all the credit card transactions occur, etc., which I think maybe is part of their argument. So if we assume that theirs is that – you only get the shield if it's compelled, and your argument is no, it's not just if it's compelled but if it's something that was taken in good faith. Could you help explain to me if you can do this what would happen if we had an interpretation that it had to be compelled? Would it basically make the shield not very useful or not applicable? What happens if we were to adopt their request that you only get the shield if it's compelled? Well, I think if the court were to adopt their interpretation of the shield in addition to their interpretation of the underlying guidance and directives from OFAC, it would apply to nobody. And that's because OFAC doesn't – it doesn't micromanage these things for banks. It doesn't say banks must do X, Y, and Z. Is it more that there's a strict liability aspect here, right? So if you actually screw up and you find out that – you find out afterwards that you screwed up and you have – and now what happens? You have to pay fines. What happens? Yes. So if I could, Your Honor, I actually think they're sort of stepping back half a step from your question. I think there are two answers. The first is that the regulations and guidance documents, in fact, do compel what Bank of America is doing here. I think the second answer is the statute is not – it doesn't call for strict scrutiny. It doesn't call for the least restrictive means for complying with OFAC directions. So as – and this is what you described as our principle.  See, it would be weird if it did to have a good-faith requirement because I don't know what that – it would either be compelled or not. It wouldn't matter what your faith – what your good, bad faith was. Exactly. But – so let me start with the first point, which is that when you look at the OFAC framework and guidelines and enforcement advisories all taken together, there really is a requirement here that large banks like Bank of America with huge consumer bases, many of which are foreign nationals, really have to take this sort of thing into consideration. I'd point the court to start with the opening of the framework that OFAC has issued. This is ER 1869. And it says – to be sure, this is not mandatory language, but I'll get us there. It says OFAC strongly encourages banks like Bank of America to employ a risk-based approach to sanctions compliance by developing, implementing, and routinely updating a sanctions compliance program. Then if you skip to 1872, it says that a fundamental element of a sound sanctions compliance program is ongoing risk assessment. It says, quote, the purpose of a risk assessment is to identify inherent risks, risks attaching to individuals because of their characteristics in order to inform risk-based decisions and controls. So because we have a limited amount of time, this is all in the briefing, and I think I understand. I'm sure my colleagues understand. I'm not sure I agree with you that when you tie it all together that it compels because it certainly seems to be that it's consistent with a risk-based approach. But I think it's at least theoretically possible you could skin this cat a different way. You could – it seems to me that there is – if somebody is a foreign nationalist citizen of Iran, then there is a – it's got to be, statistically speaking, a higher risk that they might be residing there and fall within the – but there – all I'm saying, if you assume for a second that there's a different way you could get there to try to filter, and so it wasn't strictly compelled, which I understand to be their argument, then what is your argument that it shouldn't have to be strictly compelled? Well, again, I think that just comes from the language of the statute itself. No person shall be held liable – I'm reading now from the statute – for anything done in good faith, in connection with, or pursuant to, and reliance on, not specific directions, not compulsions, but any regulation, instruction, or direction. Now, I would take, frankly, the framework to be a direction, strong encouragement to adopt a particular kind of policy. Well, one of the compliance settlements in the record is a settlement with TD Bank at ER 1855 that considers as an aggravating factor for imposing more than $100,000 in civil sanctions that TD Bank did not adequately take into account the citizenship of members of – excuse me, of nationals of North Korea. And as a consequence, violated the sanctions protocols respecting North Korea, which is also a comprehensively sanctioned nation. And in describing the aggravating factors, OFAC said this. It said TD Bank had reason to know that it maintained accounts for North Korean nationals, citizens, because at account opening, the account holders of all nine accounts presented to the bank North Korean passports. And yet the bank failed then to take additional steps to monitor those individuals and ensure that the accounts were not violating the sanctions. So the framework says develop a risk-based protocol. It says in updating and keeping that protocol current, watch out what we're doing in published settlements with banks concerning sanctions efforts. And in one of those published settlements, OFAC holds a bank as an aggravating factor liable for not taking into account that it was servicing North Korean national accounts. So I would say that's compulsion. But even if you don't think that, at the very least, a program that takes these characteristics into consideration is pursuant to and in reliance on OFAC guidance and directions. And again, to take plaintiff's position as correct is to say that in order to satisfy the liability shield, you really have to have a narrowly tailored, least restrictive means approach to interpreting the liability shield. And that isn't what the liability shield says. It says any good-faith effort, any good-faith effort. Well, I think their argument goes further than that. Their argument is that the liability shield essentially doesn't – that it has no function because the statute doesn't compel anything and, therefore, banks can't look at citizenship at all. I mean it seems absurd to me. I certainly am inclined to agree, Your Honor, because, again, if you were not to read the directions that I just laid out as compelling the sort of program that Bank of America has adopted and you were to take the plaintiff's interpretation of the statute, it's true it would apply to a null set. So can I ask you a follow-up on that? I think that's right, or at least it's a very strict reading. And so their – your argument is plain text. This thing is capacious, the liability shield. Their argument is it reduces it to either nothing or a very small world. I'm not sure they made this argument, but it seemed like there could be a middle ground, which is citizenship is a unique thing that is – that itself requires a more narrow – separate and aside from the liability. So other things you would take into account wouldn't necessarily require this sort of what you're calling strict scrutiny, which I think I understand where you're coming at that from. But that citizenship would or national – being a national form in one of these – from one of these countries. I don't know that they made that argument. Maybe I missed it, but I don't know that they made like a special argument about the citizenship as opposed – it seems like they put their eggs in the basket of that it has to be compelled. They really emphasize it has to be compelled. Is there – what if they had made that argument? Did they make the argument? And if they did, does that help them? I don't understand them to have made that argument, and I don't know how it could help them because I think it would have to be the other way around. The statute itself refers to nationals. This is the provision authorizing imposition of sanctions. It authorizes the president to bar transactions, quote, involving any interest of any foreign country or a national thereof. So that's 50 U.S.C. 1702a1. So the statute itself envisions a sanctions program that is honed in on and focuses on citizenship. So that's a statute, and the actual sanctions themselves don't necessarily sanction every Iranian national. It sanctions transactions that occur from within Iran. By individual – well, it's two things. It's got to be in Iran by an individual ordinarily resident in Iran, and who is more likely than anybody to be ordinarily resident in Iran? A citizen of Iran. Right, right, and so it totally makes sense to use that as a first cut and say that's something. If that's true, we're going to look more closely, and that just seems like what your program does. Their argument is, yeah, but you could get at it a different way since strictly being an Iranian citizen does not – is not a prohibitor. It's an Iranian citizen plus some other things, and maybe not even an Iranian citizen. If you're a non-Iranian citizen but you live in Iran, then you would be – you would be – if you're an ordinary resident there, you would be prohibited, correct? So you could see their argument is I totally understand that it helps you to get there by starting with their citizenship because that is a – it just makes common sense that that group of people are going to more often fit within the requirements for the sanctions. It's what it is to be a citizen, right, to be able to legally live there. But it isn't necessarily a perfect fit, so – and since you could get at it another way, that's why I'm struggling with the fact that it's somehow compelled. Well, but I guess it's the point, Your Honor. It isn't a perfect fit, and that's why Bank of America has adopted its Consumer Residency Monitoring Program. All it requires is every six months a refresh of documentation. And if it worked correctly, we wouldn't even be here today and there was a mistake. I guess your argument is just that mistakes sometimes happen, but that doesn't mean that the programs – Well, that's right. I mean that is what a risk-based program is. A risk-based program is not a one-to-one match. It's identify what are indicators of risk and make determinations to limit risk on which accounts to service or not. Bank of America could say we won't service any accounts for citizens of comprehensively sanctioned nations. That would be a risk-based protocol. It's taking it further. It is not taking that approach, and it's trying to narrow it down. I saw that in the briefs. Is that right? It's not illegal for Bank of America to say no Iranian citizen gets a bank account. To my knowledge, it is not illegal, Your Honor. So a little bit they're being punished for – attacked for trying to help but not – Well, exactly. Exactly. And so this is what I would submit as a reasonable approach to identifying Iranian citizens who have a political affiliation with the Republic of Iran and therefore could legally be ordinarily resident there to determine whether they are in fact not resident there and they are temporarily resident here in the U.S. and therefore not in Iran while they are banking. It is a one-to-one match for what the statute – for what the regulations say, and it is, I submit plainly, a good-faith effort to comply with the directions of both sides. But you don't think it's a one-to-one match if we think it's a 0.8 to 1.2. That's good enough in your view as long as it's good faith? Well, and risk-based because really there – It doesn't have to be compelled. It doesn't have – well, no. I think it's got to be pursuant to a direction of OFAC, which is a strong encouragement to adopt exactly this kind of policy. And if Bank of America didn't adopt this policy, it would be subject to more extreme sanctions if it did in the end violate the Iran regulations. Thank you, Your Honors. All right. Thank you, Counsel. Can I ask just a lead-off question? Absolutely, Your Honor. So I saw in the briefs that Bank of America said we don't have to – we don't have to even give bank accounts to Iranian citizens, period. We could ban – but I didn't hear a response from you all in the briefs on that. Is that true or could they – do some banks not do that? Do they just not provide bank accounts to Iranian citizens? We think that's unsupported in the record, that they're – I'm asking more the legal question. Sure, the legal question. I think that would be illegal in the view of Dr. Nia. The administration of this sanctions regulation has to be objectively reasonable. That's the touchstone of good faith. And so we don't think this is boundless or it just opens floods – it's meaningless. It's just if you're going to avail yourself of this formative defense, your actions have to be objectively reasonable. And we say there's genuine disputes of material fact as to whether they are objectively reasonable. If you look at the city of Los Angeles Department of Water and Power v. Manhart, that's 435 U.S. 702, it says there individual risks like individual performance may not be predicted by resort to prohibited classifications. You can't use citizenship or Iranian nationality as a proxy. And also the one point – other point that I would make is that we don't say that you can't consider citizenship at all. You can't wholesale not consider it. It's just as the FinCEN guidance says, there has to be a nexus to Iran. It could be broader. Citizenship could be a factor, but the U.S. also has to have other factors such that others could be disqualified. If it's only Iranians that are disqualified under their CRM, then it's a but-for cause based on a prohibited classification. If others could be encompassed within that, then it would not be a but-for cause. If an American – Did I understand you just to say your position is not that it's – they're strictly disallowed from considering Iranian citizenship, Iranian citizenship. It's that they did it wrong here. But you're not – so your position is they could – they would need to have something that was a better fit. Absolutely, Your Honor. They could. It just could not be – Iranian citizenship could not be the disqualifying factor and only the disqualifying factor. If you look to the FinCEN guidance we point to, it just says Iranian nexus. Citizenship could be one form of a nexus, but if you have a business on the border of Iran, if you have a pattern of transaction cryptocurrency trades in the Middle East, there is a whole host of factors that would just not apply only to Iranian citizens. So if there's a more holistic set of things, which is what they do with the Ukrainian population subjected to the exact same sanctions regimes, then that would be different. On the North Korea point – I know I'm out of time. Wrap it up. Go ahead. Okay. Sure. On the North Korea point, it's 31 CFR Section 510-201A2. It specifically speaks to North Korean nationals, so it's a different regime. The TD Bank decision is irrelevant. Thank you, Your Honors. All right. That concludes our argument in this case. This matter is submitted.
judges: OWENS, VANDYKE, THOMAS